[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**RECEIVED**

AUG 14 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

April D. Glenn )
)
_____ )
)
Plaintiff(s), )
)
v. The Chicago Transit )
Authority )
)
_____ )
)
Defendant(s). )

1:19-cv-05497
Judge Charles R. Norgle, Sr.
Magistrate Judge Young B. Kim

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**

1. This is an action for employment discrimination.

2. The plaintiff is April D. Glenn of the county of Cook in the state of Illinois.

3. The defendant is The Chicago Transit Authority, whose street address is 567 W. Lake St,

(city) Chicago (county) Cook (state) Illinois (ZIP) 60661

(Defendant's telephone number) (888) – 968.7282

4. The plaintiff sought employment or was employed by the defendant at (street address)
5419 W. Armstrong Ave  See additional Page (city) Chicago
(county) Cook (state) IL (ZIP code) 60646

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

5.    The plaintiff [*check one box*]

    (a)  ☐    was denied employment by the defendant.

    (b)  ☑    was hired and is still employed by the defendant.

    (c)  ☐    was employed but is no longer employed by the defendant.

6.    The defendant discriminated against the plaintiff on or about, or beginning on or about, (month) November , (day) 15 , (year) 2017 .

7.1    (*Choose paragraph 7.1 or 7.2, do not complete both.*)

    (a)    The defendant is not a federal governmental agency, and the plaintiff [*check one box*] ☑*has* ☐*has not* filed a charge or charges against the defendant

        asserting the acts of discrimination indicated in this complaint with any of the

        following government agencies:

        (i)    ☐ the United States Equal Employment Opportunity Commission, on or about

              (month)_____ (day)_____ (year)_____.

        (ii)    ☑ the Illinois Department of Human Rights, on or about

              (month) January (day) 29 (year) 2018 .

    (b)    If charges *were* filed with an agency indicated above, a copy of the charge is

        attached. ☑ Yes, ☐ No, **but plaintiff will file a copy of the charge within 14 days**.

It is the policy of both the Equal Employment Opportunity Commission and the Illinois

Department of Human Rights to cross-file with the other agency all charges received. The

plaintiff has no reason to believe that this policy was not followed in this case.

7.2    The defendant is a federal governmental agency, and

    (a)    the plaintiff previously filed a Complaint of Employment Discrimination with the

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

defendant asserting the acts of discrimination indicated in this court complaint.

☐ Yes (month)_____ (day)_____ (year) _____

☐ No, did not file Complaint of Employment Discrimination

(b)     The plaintiff received a Final Agency Decision on (month)_____

(day) _____ (year) _____.

(c)     Attached is a copy of the

(i) Complaint of Employment Discrimination,

☐ Yes     ☐ No, but a copy will be filed within 14 days.

(ii) Final Agency Decision

☐ Yes     ☐ N0, but a copy will be filed within 14 days.

8.     *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

(a) ☑     the United States Equal Employment Opportunity Commission has not

issued a *Notice of Right to Sue.*

(b) ☐   the United States Equal Employment Opportunity Commission has issued

a *Notice of Right to Sue*, which was received by the plaintiff on

(month)_____ (day)_____ (year)_____ a copy of which

*Notice* is attached to this complaint.

9.     The defendant discriminated against the plaintiff because of the plaintiff's [*check only*

*those that apply*]:

(a) ☐ Age (Age Discrimination Employment Act).

(b) ☑ Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

(c) ☑ Disability (Americans with Disabilities Act or Rehabilitation Act)

(d) ☐ National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(e) ☑ Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(f) ☐ Religion (Title VII of the Civil Rights Act of 1964)

(g) ☐ Sex (Title VII of the Civil Rights Act of 1964)

10. If the defendant is a state, county, municipal (city, town or village) or other local governmental agency, plaintiff further alleges discrimination on the basis of race, color, or national origin (42 U.S.C. § 1983).

11. Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the A.D.E.A. by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791.

12. The defendant [*check only those that apply*]
(a) ☐ failed to hire the plaintiff.

(b) ☐ terminated the plaintiff's employment.

(c) ☐ failed to promote the plaintiff.

(d) ☐ failed to reasonably accommodate the plaintiff's religion.

(e) ☑ failed to reasonably accommodate the plaintiff's disabilities.

(f) ☑ failed to stop harassment;

(g) ☑ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

(h) ☐ other (specify): _____

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

_____

_____

_____

_____

13.    The facts supporting the plaintiff's claim of discrimination are as follows:

Defendant hired me with sleep apnea and failed to take reasonable due care in keeping me from unnecessary risk of harm. When I refused certain work assignments, defendant issued procedural violations causing points to be added to my record. 4 points in a calendar year terminates me See additional pg

14.    *[AGE DISCRIMINATION ONLY]* Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15.    The plaintiff demands that the case be tried by a jury. ☑ Yes ☐ No

16.    THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a)    ☐ Direct the defendant to hire the plaintiff.

(b)    ☐ Direct the defendant to re-employ the plaintiff.

(c)    ☐ Direct the defendant to promote the plaintiff.

(d)    ☐ Direct the defendant to reasonably accommodate the plaintiff's religion.

(e)    ☑ Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f)    ☐ Direct the defendant to (specify): Pay compensatory and punitive damages as well as any other relief that is fair and equitable

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

5

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

_____

_____

_____

(g)    ☑ If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h)    ☑ Grant such other relief as the Court may find appropriate.


_____
(Plaintiff's signature)

_____April D. Glenn_____
(Plaintiff's name)

_____7932 S. Peoria St_____
(Plaintiff's street address)

(City) Chicago          (State) IL          (ZIP) 60620

(Plaintiff's telephone number) (678) – 365-9934

                                    Date: 7/30/2019

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

Item 4 continued.

210 W. 79th St. Chicago, Il. 60620, county of Cook.

Item 13 Continued

Records will show that the Chicago Transit Authority (CTA) impeded 3 State investigations and a U.S. DOL preliminary order by giving false and misleading testimony. And that, because CTA's testimony perjures them, it reasonable to conclude CTA violated multiple federal laws, and discriminated, retaliated, bullied, and harassed me during the process.

October 16, 2014, the Chicago Transit Authority (CTA) notified me through e-mail that a medical hold was placed on my application. Concentra, CTA's third-party medical examiner, placed a "Pending from sleep apnea" on my US DOT pre-placement physical. Sleep apnea is a disability defined by the Americans Disabilities Act (ADA).

CTA then, withheld my medical condition during the hiring process in 2015. In 2017, when I requested an accommodation, CTA refused citing, "We can legally schedule you like this", when I refused to work without properly resting, CTA forced me to miss assignment by not reasonably accommodating me.

> Under Title I of the Americans with Disabilities Act of 1990, it prohibits private employers, State and local governments, employment agencies and labor unions from discriminating against qualified individuals with disabilities in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment.

November 15, 2017, CTA's schedule conflicted with my ability to sleep properly. I informed transportation and business mangers Foreman and Hernandez that I suffer from sleep apnea and needed 2 more hours between shifts. Hernandez refused to change the time, citing, "We can legally schedule you like this". At the time of my request, I explained to Hernandez that I lived 25 miles away from the garage and wouldn't get much rest. He still refused to change my time.

I missed that assignment; I received 1 point to my work record; 4 points in a calendar year terminates my employment.

December 28, 2017, I had the same issue with the schedule. I called the garage at approximately 03:48 the following morning and spoke with manager Luke. I told Luke I was tired and requested 2 more hours of rest. Luke said, "Nope".

I missed the December 29th, assignment and I received a second point to my work record.

I went into the sick-book December 30th, filed a grievance January 2, 2018 (18-0001); the 2nd VP of my union called Hernandez and requested my start-time be delayed. Hernandez requested a meeting with me to discuss possible start-times.

I met with Hernandez January 3rd; senior manager Volante was in attendance. The meeting wasn't to discuss start-times, Hernandez wanted to go in depth about the collective bargaining agreement with my union and why it was legal and the only way. I set my cellphone to record and placed it on Hernandez's desk in his and Volante's presence. You can hear me ask Hernandez if his family rides the bus, he said they do but didn't want them on a bus with a sleepy Operator.

1

Item 13 Continued

After contacting the 1st VP of my union, Volante made a verbal agreement with him to delay my start-time and that no paperwork was needed. I came out of the sick-book January 3, 2018, gave Foreman my doctor's note that reads, "Restriction/Advice: Requires 10 hours between shifts". Foreman issued a procedural violation with 2 points and a 1day suspension.

> *FYI, I gave Luke an emergency room doctor's note January 29, 2018, that allowed me to return to work but not to use injured extremity. I expected to work light duty, but Luke said, "I cannot let you work after you've handed me a doctor's note saying you can't work, you're gonna have to go into the sick-book". I remained in the sick book until July 20, 2018.*

January 7, 2018, the schedule again was set to conflict with my resting time. I informed transportation manager (TM) Mrs. White that I suffer from sleep apnea and needed 2 more hours of rest. Mrs. White was able to change my start-time from 05:30 – 07:30.

However, when I returned to the garage the following morning, White said Hernandez and Volante chewed her ass off for moving my time and asked why she do it. White said she explained to them, had they kept her in the loop she wouldn't have done it, and said Hernandez and Volante instructed her to inform me that CTA will no longer be accommodating me with schedule.

Fearing management was going to continue their pursuit in forcing me to miss assignments that would terminate my employment; I filed a complaint with the Illinois Department of Labor (IDOL) January 10, 2018, (**file number 18-000005**) for retaliation. The IDOL claims to have found no violations and closed my complaint January 11, 2018.

> **Ex. A, statements, 2014 email, medical record, grievance 18-0001, interview record, emergency room note, and tap receipt.**

> **Ex. B, CTA Corrective Action Guidelines.**

The Illinois Labor Relations Board (ILRB) (Case No. L-CA-18-039) responded to my complaint January 12, 2018.

In CTA's response to my retaliation complaint for filing a grievance, CTA withheld their policies and procedures during the investigation, which is to remove me from service and send me to their medical examiner for a fitness for duty exam.

> "Charging party is unable to show a causal connection between CTA's conduct and the filing of her grievance giving that CTA scheduled her for eight hours off between shifts and she incurred misses before she filed the grievance. CTA merely continued to enforce its rules afterwards. Charging party is unable to show that her grievance prompted the scheduling issues, given that CTA was already doing so beforehand".

> **Ex. C, CTA response L-CA-18-039.**

2

Item 13 Continued

However, in CTA's response to the **Illinois Department of Labor, Whistleblowers Investigation Unit, Case No. ECN-36557**, dated June 6, 2019, CTA stated,

> When Bus Operators indicate that they are unable to perform the job as assigned, the protocol is to remove the Operator form service, and then send the Operator to CTA's medical services provider, Concentra, for a fitness for duty evaluation. Ex. B. This is due to the safety-sensitive nature of the Bus Operator position.

*CTA's exhibit B was issued 2014 after the Rail Operator fell asleep in the motor car, causing the train to go up the escalator at O'Hare airport. Incidentally, CTA changed rail operations 8 hours between shifts to 10 hours between shifts.*

**Ex. D, CTA response ECN-36557.**

CTA also stated in **ENC-36557**,

> On January 28, 2019, senior manager Jeffrey Smith removed Ms. Glenn from service so that she could undergo a fitness for duty evaluation, given that she reported needing to have 10 hours off between shifts because of her condition. CTA's third-party medical examiner cleared her to return to work without any restrictions and she was permitted to return to work three days later.

> While Ms. Glenn alleges that her "physician and CTA's doctor's" requested a schedule change for her, she fails to specify a time period when this allegedly occurred, and CTA is unaware of a doctor requesting this in January 2019.

These statements are misleading and false. Yes, I was released with no restrictions; the restrictions however were placed on CTA. This is evident from the notes written by the Clinician from Concentra, dated January 29, 2019.

**"10 hours is a reasonable accommodation between work shifts".**

**Ex. E, Clinician notes attached.**
**Ex. Medical Record MR0001 available upon request.**

Also, from **ECN 36557**,

> CTA's ARC sent Ms. Glenn paperwork so that she can request and explain what accommodation, if any, she might need. Despite CTA's attempts to assist Ms. Glenn with applying for an accommodation, she has simply chosen not to follow up.

> Ms. Glenn generally alleges that she "Voiced concerns regarding various health and safety hazards," she does not provide any information, other than reporting that she had sleep apnea.

3

Item 13 Continued

CTA has been aware of my medical condition since 2014 and notified multiple times after. **See Ex. Q 6- 10.**

**Ex. F, Reasonable Accommodation Application, Doctor's note.**

CTA's response to **the Illinois Department of Labor, OSHA Complaint No. 1432253,** dated March 19, 2019, they gave false and misleading testimony again stating,

> Ms. Glenn alleges that she notified CTA management on November 15, 2018, December 28, 2018, January 22, 2019 and February 24, 2019 that she had sleep apnea and needed 10 hours off between shifts. However, CTA is only aware of her doing so on January 22, 2019 and February 24, 2019. As an initial matter, Ms. Glenn fails to identify exactly who she notified on each date. CTA is currently unaware of her notifying CTA management on November 15, 2018 a date she was absent from work or December 28, 2018.

This statement is misleading and false **(see Ex. F, I, and Ex. Q, 4- 6)**. I was absent November 15, 2018, due to CTA removing me from service August 7, 2018. Senior manager Mr. Smith charged me with erratic behavior when I refused to snipe or go into the sick book stemming from a stressful incident caused by management. While being interviewed for this occurrence with TM Canty, Smith bursts through the door twice, gesturing with his hands while standing over me, attempting to get a response from me.

**Ex. G, Interview record, report to manager, reasonable suspicion drug test, grievance.**
**Ex. H, CTA response 1432253.**

In the **Preliminary order, Case no.:2018-NTS-00008,** CTA's Initial Submission testimony, shows CTA perjured themselves again according to their **testimony in the ECN-35667** investigation, and goes to their intent to force me to terminate myself in January 2018.

> In or about late December 2017/early January 2018, Complainant reached out to Forest Glen business manager Gilberto Hernandez to request 10 hours off in between shifts on a permanent basis.

> Hernandez could not change reporting times on a permanent basis without violating the collective bargaining agreement with her union. Complainant's basis for the request for 10 hours off between shifts was allegedly that she lived far away and because of travel time, she did not have enough time to adequately rest between shifts. At no point did Complainant provide any information to Mr. Hernandez indicating that her request was related to a medical condition, much less a disability. Accordingly, Mr. Hernandez was unable to grant Complainant's request to permanently have 10 hours off between shifts, due to manpower and contractual obligation.

**Ex. I, CTA's Initial Submission.**

4

Item 13 Continued

Secondly, on page 6 of CTA's response to the **Illinois OSHA complaint No. 1432253** CTA wrote,

> Ms. Glenn's time record, **see Ex. B**, indicate that during the pertinent time period, she was scheduled to have more than 10 hours off between shifts on consecutive days.

This statement demonstrates how CTA exaggerated "Permanently" in their Initial submission. It's on occasion the schedule conflicts with my medical condition.

Additionally, and more importantly, the union owns the rights to seniority; I'm giving up my rights; there is no violation. Take me out of line, let 2 or 3 Operators behind me in front of me, and put me back in line, that's it that's all. No Reasonable Accommodation is needed, no doctor's note, no medical exacerbation, no missed assignments, no manpower issues, and no interruption in services.

The definition for respite is: A short period of rest or relief from something difficult or unpleasant.

> Per: The Wage and Working Condition Agreement

> REST BETWEEN WORK DAYS: Employees must have a minimum of eight (8) hours between the finishing time of a run or trick picked for one (1) day and the reporting time of the following day. This provision shall apply to all employees on the extra lists.

> In emergencies, when the eight (8) hour respite for an extra employee is not possible, the time between the two (2) days of work may be less, if agreeable to the extra employee and approved by the station superintendent.

**Ex. J, Wage and Working Condition Agreement.**

The following statement can be found in the Whistleblower's, the IDOL, and the Initial submission's testimony.

> CTA utilizes Bus Operators on the extra board to cover work for other Bus Operators who do have a set schedule that are absent and utilizes them where manpower is needed.

> For safety reasons, CTA provides Bus Operators with a minimum of 8 hours off between the end of a shift on one day and the beginning of a shift on the next day

CTA claims they were not able to change reporting times on a permanent basis without violating the collective bargaining agreement with my union is an inflammatory statement.

Also, in CTA's Initial Submission they said,

Item 13 Continued

> Because the show-up time and schedules are set beforehand so that CTA can make sure to have sufficient manpower available, CTA is unable to change employee schedules last minute as it may lead to a disruption in service. Given that reporting times for the Extra board are based on an employee's seniority, Mr. Hernandez could not change reporting times on a permanent basis without violating the collective bargaining agreement with her union.

Again, this statement is false; Operators have 1 hour prior to their shift to notify CTA if they cannot show for work. That 1 hour gives CTA an opportunity to cover that Operators run. If I show up an hour early or within that time frame, the clerk will ask me to cover the open run. If CTA cannot change employee's schedules last minute, runs would be held in and services interrupted.

Additionally, CTA has over 7 thousand active Bus Operators and more than half are on duty at one time. At any given moment, 50 to 100 Operators (or more) can call off at the same time. In addition to the Operators out sick, injured on duty, on vacation, who may leave early, or running late; this is what create manpower issues that lead to interruption in services. According to the CBA, CTA doesn't have to wait no more than 8 hours to use me to cover a run or shift when they have issues.

The following seniority violations were captured through my cell phone camera while working at Forest Glen garage.

November 6, 12, 15, 21, 22, 24, 2017; December 2, 6, 8, 10, 11, 15, 16, 19, 20, 21, 22, 23, 27, 28, 29, 2017; January 8, 9, 10, 12, 13, 15, 17, 20, 21, 22, 23, 24, 25, 26, 29, 2018.

**Ex. K, Pictures of extra board schedule.**

On the system pick, I transitioned to 77th Street garage because its 1 mile away from my home.

I returned to full duty July 23, 2018. The first day, I was berated by the lead instructor Crump and business manager Payne because I didn't have the cushion rides completed.

I cannot conduct any CTA business while out of service, I wouldn't get paid for it.

Payne took me out of service and gave me 2 days to complete 18 cushion rides. She threatened me with disciplinary action if I didn't report July 25 by 15:30 to a manager on duty (MOD). Payne was supposed to allow me to continue riding with the new hires in instruction without taking me out of service.

**Ex. L, interview record and cushion sheet.**

July 25th, Payne and senior manager Smith instructed me to report on the 26th, for cushion rides starting at 05:00 and 14:30, then return at 18:40 for a live run that didn't end until 03:00. TM manager Parker who took me off the schedule forgot to inform the Clerks and other managers that she had done so, which caused TM Moore to approach me slightly aggressive with an elevated voice in the lobby. Had I not caught the error, management would have charged me with an Absents Without Leave, (AWOL).

6

Item 13 Continued

I was taken out of service July 29th, 30th, and 31st without an explanation.

The supervisor who responded to my hit and run call August 4th, (name unknown) badgered me the entire time he wrote his report because he didn't see damage to the bus. it's standard operating procedure (SOP) to report any contact with the bus, it's a safety violation and a failure to report violation.

August 7, 2018, I was taken out of service after being charged with erratic behavior. The doctor who CTA referred me to for a psychological exam, wasn't completely honest in his findings. Dr. Bylsma mentioned the harassment I experienced in his findings but not as a contributing factor to the "Reaction to server stress" (his initial diagnosis) and why I was sent for an evaluation.

Instead, Bylsma wrote:

1. Ms. Glenn is complaining primarily of a lack of cooperation from CTA managers specifically related to setting her work schedule with her *Physician-documented need to get 8 hours of sleep between work shifts* – which necessitates a 10-12 hour break between the end of 1 shift and the beginning of the next – taken into consideration.
2. I did not see the document that stipulates that need.
3. There is no observable evidence in the interview conducted with her – that she has psychological disturbance that would prelude her from returning to work as a CTA Bus Operator.
4. Ms. Glenn reports that she wants to return to work as soon as possible. She also stated that she wants to be safe when operating the bus.

My concerns were:

1. This was not my chief complaint; I was only in service for 15 days. I complained about the number of incidents I has in the short period of time I was there, and that I was being harassed by 77th management because I filed charges against CTA for discrimination.
2. I informed Bylsma I had all the documents, he never asked to see them.
3. Bylsma's initial diagnosis was, F43.9 Reaction to serve stress", opposite of erratic behavior, and I never reported having an issue with my schedule at 77th. I specifically said, "77th is harassing and retaliating against me and it's causing me stress".
4. I never reported wanting to return to work as soon as possible. I told Bylsma I didn't trust management, especially Smith, because he was trying to provoke me, and that I did not feel safe because of the behavior displayed by management.

I also reported to Bylsma that Deshone Maddox the Disability Analyst, delayed my return to work (Temporary Medical Disability Area 605) from June 2018, to July 20, 2018, without an explanation, and that she deliberately withheld my authorization form giving consent for wage deductions of $100.00 for healthcare contribution paid by CTA, that left me with a $21.76 paycheck for August 8, 2018.

I also reported that when I called Maddox about the incident, she first said she had no knowledge of the form, but then claimed to have investigated and said Human Resources never received the

7

Item 13 Continued

form. When I told her, the form was apart of the packet she gave me, she asked if I had a copy of it, and since I didn't, Maddox said there was nothing she could do about it.

Bylsma contradicted himself. I felt he was trying to warn CTA of the liability of not adhering to my doctor's orders so, by writing it in his findings and not the true nature of what I reported to him. Bylsma's dishonesty caused me to look up his license to practice in the State of Illinois. It appears he was not licensed at the time of our meeting.

Additionally, my Primary Care Physician kept me out of service until November 21, 2018.

**Ex. M, IDFPR Case 2018-09832**

Incidentally, Ms. Maddox delayed my return to duty again November 21, 2018, until December 4, 2018. As policy, when returning to duty, I am to report to CTA headquarters to authorize CTA do a background check, drug and alcohol test, driving abstract record, and the wage deduction. Ms. Maddox didn't request a meeting with me but instructed me to go straight Concentra. I remember the medical staff a Concentra saying Ms. Maddox's email was confusing because they administered the wrong physical.

Review of my previous pay-slips reveal, CTA was paying themselves with my vacation and holiday hours.

**Ex. N, Emails dated December 4, 2018, repayment plan
letter, voluntary consent, Concentra medical records, fax,
pay-slips.**

January 23, 2019 CTA accommodated with 2 additional hours. At the request of senior manager Smith, I completed a "Report to manager", submitted my doctor's note from January 2, 2018, told him I applied for an accommodation when I was working at Forest Glen, and that Dr. Bylsma also required 12 hours between shifts.

Smith claimed it was an easy fix, he'd keep the note in my file, and he wouldn't require me to go through the Accommodation Review Committee (ARC).

However, January 28, 2019, I was allegedly taken out of service for making the request. Smith claimed they were trying to avoid the 28th because they were looking for me on the 24th, (my 3-day weekend) that wasn't truth. I received multiple calls from TM Moore July 31st, informing me that I was on the schedule for February 1st, and needed to report for duty. They could have used that same energy on the 24th, 25th, and the 26th, to avoid taking me out of service on the 28th.

Smith said he confirmed with Hernandez that I did not have a reasonable accommodation on file (I never claimed to), accused me of not making my relief on time, not returning to the garage after my shift, not turning in my daily report, and coerced me into a reasonable suspicion drug and alcohol test.

The young lady I played dominos with offered to complete a "Report to manager" confirming my whereabout, but Smith said he'd take her word for it.

8

Item 13 Continued

Again, I believe Smith was trying to provoke me into responding to his torts indignantly while in the presence of TM Morris, for the purpose of tarnishing my work record and to have the appearance that I am aggressive and unruly to accelerate discipline against me that would separate me from the company.

My daily report disappeared, Smith instructed Morris to issue a procedural violation February 5th, that threatened accelerated discipline. I now tap my I.D. at the end of my shifts.

**Ex. O, Report to manager, drug test, 2 interview records, grievance 19-0137.**

Records will show that on the evening of February 24, 2019, I returned to the garage at 20:24. I was required to complete 2 incident reports before leaving for the night that took over an hour to finish. That period reduced the time between shifts to approximately 8 hours; I was scheduled to report at 05:40 the following morning. The business manager denied my accommodation because I didn't have a reasonable accommodation on file.

**Ex. P, 2 CTA interview records dated February 24, 2019, tap receipt**

I went into the sick-book February 25th, for documentation purposes I reported sleep apnea. My short-term disability claim was denied for reasons not applicable to CTA's administrative procedure (AP) 1010.

I filed multiple appeals with Sedgwick and each time they gave a blanket statement "Your medical does not support your absence from work", never explaining what specifically about my medical doesn't support.

I spoke with Samantha Rochkus the Sedgwick rep May 5, 2019, she claims to have just received the last two pages of my appeal from April 18th, and that she was approving my claim but needed 2 days to process it. I called on the 7th, when I didn't receive an e-mail stating as such. The rep I spoke to said she had no record of a Samantha Rochkus and that Xavia Crittle was handling my claim and it was still denied from March 20th.

Supervisor Patricia Cephus called me May 9th and said Samantha hadn't worked for the company in a while and the person I spoke to should have never told me my claim was approved. Cephus said my doctor filled out the wrong form (what Sedgwick sent me) and that I need to be under the care of a psychiatrist.

Ms. Rochkus failed to mention a different form was needed in her denial letter, I was unaware for 59 days, and I wasn't notified of the change in disability rep. Without my doctor faxing the new form to Sedgwick, Cephus said my claim would probably still be denied. It was denied with the same blanket statement. "Medical does not support".

I called corporate to voice my concerns; manager Stephanie Fontanez said they wanted to have a Physician to Physician conference to get a clear understanding of what I was being treated for. Sedgwick e-mailed a new release of information June 5, 2019, reached out to my doctor June 21st, and denied my claim July 17, 2019 without speaking to my Physician.

9

Item 13 Continued

I believe CTA instructed Sedgwick to deny my benefits to cause a hardship and to get around the subpoena for medical records in the preliminary order. I filed a motion to quash because CTA was trying to get records beyond the scope.

**Ex. Q, Emails, denial letters, appeal contents.**

July 24, 2019, CTA drafted a letter requesting I report to 77th by July 30, 2019 showing cause for my absence, failure to comply would cause my discharged from the company. The envelops are postmarked July 29, 2019, I didn't receive them until August 3, 2019. This is evident by the United States Postal Service delivery confirmation receipt.

Also, the letter appears to have been written by then Business manager Ms. Arlana Johnson, and mailed from 210 W. 79th St. 60620 (same zip code as mine), but review of the envelops reveal they were mailed from 60661 zip code, an area where CTA headquarters is located.

CTA is still trying to terminate my employment in retaliation for filing charges against them.

**Ex. R, Envelops, confirmation receipt, 5-day letter, email with reasonable accommodation attached sent to Ms. Hampton of CTA headquarters.**

**Ex. S, Executive order 2016-02, US DOT certificate, CTA specialized books, letter to CTA President, email to CTA's EEO, CTA's response, administrative procedure 1601.**

10

Item 13 Continued

In closing,

The Chicago Transit Authority operates the nation's second largest public transportation system and covers the City of Chicago and 35 surrounding suburbs. On an average weekday, approximately 1.6 million rides are taken on the CTA.

CTA is entrusted with the safety of its employees, passengers and the general public.

Through enhanced training and education, standard operating procedures, special operating procedures, specialized rule books, administrative procedures, executive orders, bulletins, and instructions, CTA says this will help me to develop to my fullest potential while setting clear goals and a standard in priorities.

Coupled with CTA's training, my personality, viewpoint, and ability to problem solve, I'm able to accomplish our mission. I've been achieving this since 2015, this is evident through my work record.

However, the stance CTA has taken against me, as a Bus Operator with a safety sensitive position, has left me feeling disappointed, hurt, angry, and causes me to distrust them.

On the surface, CTA operates within their established rules. Yet, just below the infrastructure, there's a cruel truth of how unjust their practices really are.

Their willful ignorance towards me and my disability, by definition, is to avoid having to make an undesirable decision that such information would prompt them to make.

This willful ignorance challenges my ability to safely and cordially operate the bus (a 42,752-pound vehicle) for which I am charged/trusted to operate.

The employer-imposed secrecy of harassing, retaliating, and discriminating against me in the shadows, jeopardizes my safety, my job, my financial security, and my career prospects. The power disparity between them and me, coupled with the threat of retaliation, CTA is trying to whip, subjugate, and silence my protest, to fertilize the growth of hopelessness, fear, and defeat while I am challenging the practices of the Chicago Transit Authority.

Given the fact that the Chicago Transit Authority is comfortable with: 1) withholding information, 2) giving false and misleading testimony in State and Federal investigations and hearings, and 3) failing to follow their own policies and procedures, demonstrates the hostile environment and serial harassment I endure while in my workplace; it undermines my equality, safety, and dignity. My civil rights should not be on the bargaining table, and I should be able to work in an environment free from harassment and other forms of discrimination.

CTA admittedly promote an unhealthy work environment by not adhering to my verbal notifications that I need more rest, by not following the medical advice from multiple doctors including their own, and by not following their own policies and procedures. This particularly emphasizes CTA's wrongdoing, especially when my sleep apnea is documented.

11

Item 13 Continued

It sadly demonstrates how CTA push for efficiency with no support, and when the harshness of the grind wears me down, CTA can simply wash their hands and say, "It's our policy", but some policy's conflict with others and with the collective bargaining agreement.

The fact of the matter is simple, I cannot effectively do my job if I'm sleepy. There is no rocket science behind "I need more time to rest". CTA's exhibit B in Case No. ECN-36557, exemplifies this.

> **All CTA employees share the responsibility for providing our customers with safe, clean, on-time, courteous and efficient transit service. Operations employees, in particular, must be alert, well rested, coherent and healthy to be able to perform their jobs in a safe and responsible manner. Employee fatigue, sickness or impairment must be considered as a potential underlying factor in virtually all accident and injuries.**
>
> **Management will decide if the employee is fit to work based on factors including both the employees work and sleep schedule, and his or her mental or physical condition.**

Operating a CTA bus is inherently stressful with the various people who use us for transportation, in addition to the pedestrians and rush hour traffic; the lack of support from CTA increases the levels of stress; it's humiliating, demeaning, and demoralizing.

CTA's behavior constitutes an intent to cause harm. This is systematic bullying that has and continues to deeply affect me mentally, spiritually, and physically.

CTA doesn't just lack reasonable responsibility for safety, they lack compassion and common decency for a fellow colleague, and it's a betrayal of public trust.

How many people must die at the hands of a sleepy Operator behind a CTA vehicle?

I'm fighting for my life, your life, your family members lives, your friends' lives, and anybody who rides, drives alongside, or walks near a CTA bus.

I do not want to die, injury myself or anyone else.

Please, this is a call for action.

12

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.

# 18W0131.01

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ IDHR | |
| ☐ EEOC | 2018CF2422 |

### Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.) | TELEPHONE NUMBER (include area code) |
|---|---|
| April D. Glenn | (678) 365-9934 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 7932 S. Peoria Street. Apt. 2 | Chicago, Illinois 60620 | MM / DD / YYYY |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES. MEMBERS 15+ | TELEPHONE NUMBER (include area |
|---|---|---|
| Chicago Transit Authority | | (888) 968-7282 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 567 W. Lake Street | Chicago, Illinois 60661 | Cook |

| CAUSE OF DISCRIMINATION BASED ON: | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA) LATEST (ALL) |
|---|---|
| Disability | 11/16/17    12/29/17 |
| | ☐ CONTINUING ACTION |

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

### SEE ATTACHED

Page 1 of 2

MFP

I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SUBSCRIBED AND SWORN TO BEFORE ME

THIS ⁁7 DAY OF _____ 201⁁

X _____
NOTARY SIGNATURE

PATRICIA ALMARAZ
Official Seal
Notary Public – State of Illinois
My Commission Expires Sep 18, 2021

NOTARY STAMP

X _____    3/15/2018
SIGNATURE OF COMPLAINANT    DATE

I declare under penalty that the foregoing is true and correct I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief

EEO-5 FORM (Rev. 7/12-INT)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.

#19W1212.10

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ IDHR | 2019CF0944 |
| ☐ EEOC | |

### Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.) | TELEPHONE NUMBER (include area code) |
|---|---|
| April D. Glenn | (678) 365-9934 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 7932 S. Peoria St., Apt. 2 | Chicago, IL 60620 | MM / DD / YYYY |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES, MEMBERS 15+ | TELEPHONE NUMBER (include area |
|---|---|---|
| Chicago Transit Authority | | (312) 664-7200 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 567 W. Lake St | Chicago, IL 60661 | Cook |

| CAUSE OF DISCRIMINATION BASED ON: | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA)  LATEST (ALL) |
|---|---|
| Retaliation | 7/23/18     11/21/18  ☐ CONTINUING ACTION |

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

<u>S E E   A T T A C H E D</u>

Page 1 of 6

I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SUBSCRIBED AND SWORN TO BEFORE ME

THIS ___19___ DAY OF ___December___, 2018.

X _Jacquelyn Turner Hamb_
NOTARY SIGNATURE

OFFICIAL SEAL
JACQUELYN TURNER HAMB
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/12/21

NOTARY STAMP

X _____ 12/19/2018
SIGNATURE OF COMPLAINANT     DATE

I declare under penalty that the foregoing is true and correct I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief

EEO-5 FORM (Rev. 7/12-INT)

ILLINOIS DEPARTMENT OF

**Human** **Rights**

## PROCEDURES FOR NON-HOUSING CHARGES

Complainant: __April Glenn__          Your Charge Number: _____2019CF1558_____

Service of Charge: After the Complainant files the charge and it is given a charge number, IDHR serves the charge on the Respondent (company, union, agency, etc.). Keep a copy of your charge documents. Always refer to your charge number when calling or corresponding with IDHR.

Responsibility to Cooperate: Both Complainant and Respondent ("the parties to the charge") have a responsibility to cooperate with IDHR and must notify us of any change in address or telephone number immediately. If we cannot reach the Complainant by telephone and do not get a response to our letters, we have to dismiss the case. The Complainant also has a responsibility to lessen the damages, including a responsibility to work.

Role of IDHR: IDHR's role is to conduct a NEUTRAL and FAIR investigation of the allegations in the charge. Although we represent the state's interest in eliminating discriminatory practices in Illinois, we do not represent either party. You must obtain your own attorney if you want someone to advocate for you or represent you but an attorney is not required.

Mediation Option: Mediation is an opportunity for the parties to the charge to meet and discuss how the issues raised in the charge can be resolved before the investigation begins. A mediator facilitates the mediation conference, and there is no cost to either party. Mediation is available for any employment or public accommodation charge, and conferences are held in IDHR's Chicago office. Request mediation by calling (312) 814-6889 or email "IDHR.Mediation@illinois.gov".

Investigation: Once the case is assigned to an investigator, the investigator contacts both parties to discuss the case in more detail and reviews the Respondent's verified response to the charge and response to IDHR's questionnaire. The investigator will also ask both parties to consider a voluntary settlement that would resolve the matter. Both parties are required to attend a fact-finding conference, which is a meeting conducted by the investigator where the Complainant and representatives of the Respondent answer questions, so the investigator can determine if there was a violation of the Human Rights Act. The investigator obtains pertinent documents from both parties and contacts relevant witnesses. Both parties should answer the investigator's questions and provide as much relevant information as possible to assist in the investigation, including helping the investigator to identify pertinent documents and locate witnesses. The Human Rights Act requires that IDHR conclude all proceedings and make a finding within 365 days of the perfected charge being filed. If necessary, the investigator will request that both parties sign an extension form to give IDHR more time to complete the investigation. If IDHR does not make a finding by the 365th day, or within any extension of that period agreed to in writing by all parties, the Complainant may file a complaint at the Human Rights Commission ("HRC") or commence a civil action in a state circuit court of appropriate venue during the 90-day period following the expiration of the time allowed for investigation.

Investigation Report: After completing the investigation, the investigator writes a report summarizing the information obtained and making a recommended finding based upon the relevant evidence. After approval, IDHR sends a copy of the report to both parties to the charge.

Appeal Rights: If IDHR dismisses the case, the Complainant has the option of either (within the time periods specified in the Act) 1) filing a Request for Review with the HRC, OR, 2) commencing a civil action in a state circuit court of appropriate venue. The Respondent may file a request for review within 30 days of a notice of default recommendation.

Public Hearing: If evidence of discrimination is found, then Complainant has the option of either (within the time period specified in the Act) 1) requesting IDHR to file a complaint on Complainant's behalf with the HRC, OR, 2) commencing a civil action in a state circuit court of appropriate venue. If Complainant requests IDHR to file a complaint with the HRC, an IDHR attorney will be assigned to help the parties resolve or "conciliate" the charge. If a settlement agreement is not reached, the Department will file a Complaint of Civil Rights Violation with the HRC on behalf of Complainant, which terminates the IDHR process. The Complainant then bears the burden of proving the case before the HRC.

Federal Court: An employment charge may be cross-filed with the EEOC (A, E, or F in the charge number). A cross-filed charge is assigned an EEOC charge number to protect the Complainant's federal rights, but IDHR will conduct the investigation on EEOC's behalf. At any time, the Complainant may request a Right to Sue notice from the EEOC and file the case in federal court. Note: Complainants have no right to proceed in federal court against state agency Respondents under the ADA or ADEA. IDHR advises consulting an attorney before withdrawing the charge to determine if this is the best course. IDHR cannot give legal advice. If the case is filed in federal court and the Complainant has not withdrawn, IDHR will stay the investigation.

**For a copy of the Human Rights Act or IDHR's Rules and Regulations, see our web site at www.illinois.gov/dhr.**

Rev. 2/12

**U.S. Department of Labor**   Office of Administrative Law Judges
800 K Street, NW
Washington, DC 20001-8002

(202) 693-7300
(202) 693-7365 (FAX)



Issue Date: 05 October 2018

CASE NO.:   2018-NTS-00008
OSHA NO.:   5-1260-18-093

*In the Matter of:*

**APRIL D. GLENN,**
*Complainant,*

v.

**CHICAGO TRANSIT AUTHORITY,**
*Respondent.*

## NOTICE OF ASSIGNMENT AND PRELIMINARY ORDER

### NOTICE OF ASSIGNMENT

This case has been assigned to Carrie Bland, Administrative Law Judge (ALJ), U.S. Department of Labor, for hearing and decision. All future pleadings, responses, and correspondence should be addressed to me at the above address and include the case name and number. Telephone inquiries should be directed to Whitney Morgan, Law Clerk at (202) 693-7372 and David Showalter, Law Clerk at (202) 693-7414, or Ms. Sheila Smith, Legal Assistant, at (202) 693-7315, and not to me.[1]

### PRELIMINARY ORDER[2]

I.   **NAMED PARTIES**. This pre-hearing order is being sent to the parties and their counsel as identified by the District Director on the service sheet and other supplemental information in the file. **All persons served should review the service sheet to ensure that the proper parties have been served.** Any errors or omissions should be brought to the attention of this office promptly.

II.   **APPLICABLE RULES OF PROCEDURE**. This matter arises from a complaint filed under the employee protection provisions of the National Transit Systems Security Act of 2007, 6 U.S.C. § 1142, ("NTSSA" or the "Act") and the implementing regulations at 29 C.F.R. Part 1982.

---

[1] *See* 29 C.F.R. § 18.14 (prohibiting the parties, their representatives, or other interested persons from engaging "in ex parte communications on the merits of a case with the judge").

[2] The parties are encouraged to carefully read this Preliminary Order as processes have changed.

The general rules of practice and procedure published at 29 C.F.R. Part 18, Subpart A,[3] apply unless the Act or its implementing regulations impose a different requirement. 29 C.F.R. § 18.10.

III.     **REPRESENTATION**. A non-attorney representative or attorney not in good standing with his or her licensing jurisdiction must obtain approval of the undersigned before undertaking representation in this matter. Request for approval must be submitted **no later than 14 days** after receipt of this Order or a request by either party to undertake representation. Any request that does not comply with 29 C.F.R. § 18.22 may be summarily denied.

IV.     **DISCOVERY**. Formal discovery is to be conducted in this matter pursuant to 29 C.F.R. §§ 18.50–18.65 unless otherwise provided in this Preliminary Order. **Within 120 days** from the date of this order, **the parties will conclude discovery**. No extensions of time will be granted absent extraordinary circumstances.

A. **INITIAL CONFERENCE**. Within 14 days from the date of this order, the parties must meet and confer regarding the matters set forth in 29 C.F.R. § 18.50(b)(2). The initial conference may be held in person, via telephone or video conference, or other means mutually acceptable to the parties. The attorneys of record and any unrepresented parties that have appeared in the case are jointly responsible for arranging the conference. For the instant case, the parties will not be required to submit a written discovery plan to the presiding Judge.

B. **INITIAL DISCLOSURES**. Within 21 days from the date of this order, and without awaiting a formal discovery request, the parties must provide to all other parties the documents and information set forth in 29 C.F.R. § 18.50(c)(1)(i), to the extent that they have not previously been exchanged. All disclosures must be made in writing, signed, and served. The parties must supplement the disclosures when required by 29 C.F.R. § 18.53(a). The parties should be mindful of the provisions of 29 C.F.R. § 18.50(c)(1)(vi) with respect to unacceptable excuses for failing to make the disclosures described above.

C. **INITIAL SUBMISSIONS**. **Within 21 days of the date of this Order**, the parties much <u>each</u> provide a statement in writing to the court and served upon each other, that sets forth the party's position on the following:

   a. Whether the Complainant's complaint to OSHA and the Complainant's request for hearing were timely filed;
   b. Whether the parties are properly identified and designated;
   c. The Complainant's asserted "protected activity," with reference to the specific provisions of law that, in the Complainant's view, applies; and
   d. The Respondent's alleged "adverse action(s)."

---

[3] Note that 29 C.F.R. Part 18, Subpart A, has been revised effective June 18, 2015. Review the rules closely as there are changes and additions, such as § 18.31 that requires redaction of personally identifiable information from filing and exhibits similar to Federal Rule of Civil Procedure 5.2.

D. The parties will not serve the undersigned with copies of interrogatories, requests for production, or notices of deposition except as required in connection with a motion to compel disclosure or discovery.

E. As soon as practicable after completion of discovery, the parties will consult as to whether settlement, remand, telephonic hearing, in-person hearing, or decision on the evidentiary record is appropriate, and shall inform the undersigned accordingly.

   a. If neither settlement nor remand is possible, and no dispositive motions are anticipated, the parties will prepare and file with the undersigned **within 21 days** after the conclusion of discovery, a Joint Prehearing Statement prepared in accordance with 29 C.F.R. § 18.80(c). The Statement must include a listing of any period during **the subsequent 90 days** in which counsel are **unavailable** for hearing due to previously scheduled judicial proceedings or other good cause shown. Upon receipt of the Statement, the undersigned will issue an appropriate scheduling order with further direction to the parties.

   b. If the parties determine that neither settlement nor remand is possible, the parties must, within **14 days** after the submission of the Joint Prehearing Statement, disclose to the other parties the identity of any expert witnesses, including vocational experts, who may testify, either live or by deposition. This disclosure must be accompanied by an expert witness report or disclosure as required by 29 C.F.R. § 18.50(c)(2). A written report or disclosure must be supplemented as required by 29 C.F.R. § 18.53.

## V. **MOTIONS**.

A. All motions and other requests for relief from the ALJ, including requests for extensions of time or continuances, must be submitted in written motion form, with a caption, and not by letter. *See* 29 C.F.R. § 18.33. If the motion is opposed, the motion must contain a declaration that the parties have made a good faith effort to resolve the dispute giving rise to the motion before filing such motions with the presiding Judge. Such a declaration is not required for unrepresented parties and for motions specified in 29 C.F.R. § 18.33(c)(3). All contested motions must support the factual basis for the requested relief by including sworn affidavits, declarations under penalty of perjury, or other proof. Any motion made in letter form or failing to contain the declaration noted above may be summarily denied, as may any dispositive motion or motion to compel disclosure or discovery that is not accompanied by a memorandum of points and authority and supporting evidence.

B. Any motion for summary decision will be served and filed **no later than 30 days** after the close of discovery. Responsive pleading is required and the non-moving party will file an opposition or other response **within 14 days** of service of the motion for summary decision. No further reply may be filed by the moving party without prior approval from the undersigned.

C. Any motion for summary decision or response must include a memorandum of points

- 3 -

and authority as well as proposed findings of fact and conclusions of law. The factual basis for relief must be supported by sworn affidavits, declarations under penalty of perjury, or other proof. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by the following:

    a. Citation to specific parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

    b. Demonstration that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

D. The parties are directed to conduct a review of all documents that are to be made a part of the formal record. Any documents received that are not clearly legible will be given no weight.

E. If any issues remain to be adjudicated after decision is rendered concerning the motion for summary decision, the undersigned will issue an appropriate scheduling order at that point with further direction to the parties.

VI.    **SUBPOENAS**. Requests for subpoenas must be in writing pursuant to the provisions of 29 C.F.R. § 18.56. Appropriate subpoena forms and additional information can be found at: http://www.oalj.dol.gov/SUBPOENAS.HTM. A party may also request that the form be mailed to the party in lieu of download from the site.

A. **Requests for subpoenas must be accompanied by a cover list containing the names of persons or entities being subpoenaed.**

B. **A showing of good cause must be made for requests consisting of greater than 10 subpoenas.**

C. It is the responsibility of the parties to prepare and serve subpoenas upon any witness and to tender any required costs and expenses. At least 5 days prior to service of a subpoena upon a non-party, the serving party must give written notice to all other parties of the subpoena contents and identity of the non-party. Subpoenas provided for this case must be used only for this case.

D. **Blank subpoenas will not be issued.**

VII.    **SETTLEMENTS**.

A. OALJ has established a Settlement Judge Program, which is available to litigants, 29 CFR § 18.13.[4] Any requests for appointment of a Settlement Judge in this case must be a joint request and submitted in writing addressed to the D.C. District Office District Chief Judge.

---

[4] Information concerning the program is available online at www.oalj.dol.gov/SETTLEMENT_JUDGE.HTM.

B. The parties must advise the presiding Judge immediately of any settlements reached in this matter. **Completed settlement documents must be submitted within 30 days after agreement, unless the administrative law judge extends the time period for good cause.**

VIII. <u>**SERVICE**</u>. Facsimile and E-Mail filings and service are not authorized or permitted <u>without prior permission from one of the three (3) contact individuals listed above</u> or unless explicitly permitted by statute or regulation. *See* 29 C.F.R. § 18.30(b)(3)(i). The parties are advised that any motions or correspondence to me must be accompanied by a statement indicating that a copy has been mailed to the opposing parties. Documents are deemed filed when they are received by the Court. Documents received electronically without prior authorization will not be added to the case file. A party that is authorized to file a document by electronic means will not file the original signed document to be substituted into the record unless expressly directed by the undersigned. The party must retain the original document until the conclusion of this matter.

IX. <u>**CONSEQUENCES OF FAILURE TO COMPLY**</u>. Failure to comply with the provisions of this order may result in the imposition of sanctions including, but not limited to: the exclusion of evidence, the dismissal of the claim, the entry of a default judgment, or removal of the offending representative from the case. 29 C.F.R. §§ 18.12(b), 18.35(c), 18.57 and 18.87.

**SO ORDERED.**



Digitally signed by Carrie A. Bland
DN: CN=Carrie A. Bland,
OU=Administrative Law Judge, O=US
DOL Office of Administrative Law
Judges, L=Washington, S=DC, C=US
Location: Washington DC

**CARRIE BLAND**
Administrative Law Judge

Washington, D.C.